07 CV 2252

Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED

MAR 1 5 2007

U.S.D.C. S.D. N.Y
CASHIERS

| | |
|---|---|
| LARRY PATEL, Individually and On Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| v. | |
| WORLDSPACE, INC., NOAH A. SAMARA, SRIDHAR GANESAN, UBS SECURITIES LLC, and COWEN & CO. LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel (which investigation included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about WorldSpace, Inc. ("WorldSpace" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of a class of purchasers of  WorldSpace common stock pursuant to the initial public offering ("IPO") of WorldSpace common stock (the "Class").  WorldSpace is a satellite-based radio and data broadcasting service, primarily in India and China, which conducted an IPO commencing on August 4, 2005, in which a total of 11,868,400 shares were sold to members of the investing public.

2.     The representations made in connection with the sale of WorldSpace common stock in the IPO were materially false or misleading because subscribers who had purchased a three-month, pre-paid subscription to the WorldSpace "access control system" pursuant to a promotional offer (the "1999 Promotion"), but who declined to continue or to pay for a subscription following the end of the promotional period, were not timely removed from the Company's subscriber count. Rather than report these expired subscriptions as "churned,"[1] defendants continued to include these expired subscriptions in the Company's subscriber count for an additional 90 days following the expiration of the initial three-month promotional period. Subscriber count is a very important metric for WorldSpace because its business is subscription-based. Investors and analysts consider subscriber count as a barometer of the Company's success and prospects. The price of the Company's common stock declined materially when it was disclosed that WorldSpace had included expired subscriptions in its subscriber count. WorldSpace stock was sold in the IPO at $21 per share. They have since lost 80% of their value and trade currently at $4.10 per share.

3.     Plaintiff's Securities Act claims are not based on any knowing or reckless misconduct on the part of the defendants -- *i.e.*, they do not allege, and do not sound in, fraud. Rather, they are premised on the fact that there were material misrepresentations and omissions

---

[1]"Churned" refers to canceled, expired or otherwise discontinued subscriptions. Churned subscriptions are non-paying, and thus produce no revenue for the Company.

- 2 -

in the prospectus filed with the SEC as part of a Form S-1 registration statement (the

"Registration Statement and Prospectus"), as well as defendants' other public statements

throughout the relevant period, and the defendants' negligence in failing to recognize this fact.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of

the Securities Act (15 U.S.C. §§77k and 77(o)).

5.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 22(a) of the Securities Act (15 U.S.C. §77v(a)) and 28 U.S.C. § 1331.

6.      Venue is proper in this Judicial District pursuant to Section 22(a) of the

Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. § 1391(b).

Many of the acts and transactions alleged herein, including the dissemination of materially false

and misleading information, affected persons in this District.  Defendant Cowen & Company,

LLC is headquartered in this District.

7.      In connection with the acts, conduct and other wrongs alleged in this complaint,

defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and

the facilities of the national securities exchange.

## PARTIES

8.      Plaintiff Larry Patel purchased shares of WorldSpace common stock pursuant to

the IPO and was damaged economically.

- 3 -

9.     Defendant WorldSpace, Inc. is a Delaware corporation headquartered in Silver Spring, Maryland. Together with its subsidiaries, WorldSpace designs, develops, constructs, deploys, and finances a satellite-based radio and data broadcasting service primarily in India and China. It offers various international, national, and regional radio programming services, which include music, news, and entertainment channels. The Company, through its subscription-based service, provides content, multilingual programming, geographic coverage and advertising.

10.    Defendant UBS Securities LLC ("UBS") was an underwriter and the sole book-running manager of the WorldSpace IPO.  UBS Securities LLC is a broker-dealer whose parent, UBS AG maintains corporate headquarters in New York, New York.

11.    Defendant Cowen & Co., LLC. ("Cowen," formerly "SG Cowen & Co., LLC") was an underwriter of the WorldSpace IPO.  Cowen is  headquartered in New York, New York, and provides investment banking services, including underwriting, equity research, sales, trading and mergers and acquisitions advice.

12.    Defendant Noah A. Samara ("Samara") is, and was at all times relevant hereto, the Company's Chairman and Chief Executive Officer (CEO).

13.    Defendant Sridhar Ganesan  ("Ganesan") is, and was at all times relevant hereto, the Company's Executive Vice President and Chief Financial Officer (CFO).

14.    Defendants Samara and Ganesan are sometimes referred to hereinafter as the "Individual Defendants."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action on his own behalf and on behalf of all purchasers of the common stock of WorldSpace issued pursuant and/or traceable to the Company's IPO. Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Approximately 11.8 million shares of the Company's common stock were sold in the IPO. The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of WorldSpace or its transfer agent or the underwriters for the IPO. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions.

17.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intends to prosecute this action vigorously.

18.     Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff's and all the Class members' damages arise from and were caused by the same

false and misleading representations and omissions made by or chargeable to Defendants.

Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

19.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)     Whether documents, including the Registration Statement and Prospectus, press releases, and public statements issued by Defendants to the investing public omitted and/or misrepresented material facts about WorldSpace and its business; and

(c)     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

**WORLDSPACE'S IPO REGISTRATION
STATEMENT/ PROSPECTUS WAS MATERIALLY FALSE AND MISLEADING**

21.     WorldSpace, Inc. designs, develops, constructs, deploys, and finances a

satellite-based radio and data broadcasting service primarily in India, China, Africa, the Middle

East, and Western Europe.

22.     To receive the Company's broadcast content WorldSpace subscribers must

purchase a receiver which processes, decodes and descrambles the signals to allow users to

receive the encrypted programming content. Each receiver is individually addressable via a

unique identifier that can be used to unlock specially coded audio or multimedia signals used to

transmit free, subscription and/or premium services. A "passcode," valid for varying periods of

time depending upon the length of the subscription purchased and paid for, is provided to a

subscriber and entered into the receiver. Passcodes are re-validated on a quarterly basis. Upon

subscription renewal, a new passcode is provided and similarly entered into the receiver.

23.     WorldSpace accessed the public equity markets through an initial public offering

of WorldSpace common stock on August 4, 2005 (the "IPO"). The IPO was accomplished

pursuant to the Registration Statement and Prospectus filed April 13, 2005 with the SEC, and

11,868,400 shares of WorldSpace common stock were offered and sold to Plaintiff and other

members of the investing public at a price of $21.00 per share.

24.     The Registration Statement and Prospectus was signed by Defendants Samara and

Ganesan, among others, and unambiguously stated the importance of the Company's subscriber

count: "We believe that the most important factor for our success will be the successful

acquisition and retention of paying subscribers." Additionally, with respect to the Company's

current subscriber count, the Registration statement noted that "[a]s of June 30, 2005, we had

more than 63,000 paying subscribers, including more than 27,000 in India."

25.     The Registration Statement and Prospectus further indicated that the Company's

continued viability was critically dependent on the acquisition and retention of a sufficiently

large subscriber base, stating in relevant part that:

> "We expect to fund marketing and distribution costs from the proceeds of this
> offering as we increase the number of subscribers to our service to a level
> sufficient to generate a stream of cash flows to cover these and other operating
> costs... **our ultimate profitability and the timing and extent of any need for**
> **additional capital resources are materially dependent on the ability to**
> **generate our revenue through substantial increases in subscribers,** among
> other factors.
>
> * * *
>
> Revenue
> **We expect that subscription fees will be the main source of revenue for the**
> **Company in the future, followed by revenue from equipment sales and from**
> **the provision of government services.** Although we expect revenue from
> equipment sales to increase as we fully roll out our subscription services, initially
> in India and subsequently in China, we expect that equipment sales as a
> percentage of total revenue will decline, since the percentage increase in revenue
> from equipment sales is anticipated to be much less than the percentage increase
> in revenue from subscription sales. We do not expect revenue from leasing
> capacity to constitute a significant portion of our future revenue as we are
> intending to focus primarily on subscriber acquisition and will utilize our capacity
> to broadcast content tailored to consumer demand in the different markets within
> our broadcast coverage area.

[Emphasis added.]

26.     The discussion of the Company's subscriber count in the Registration Statement

and Prospectus concerning WorldSpace's operations and prospects were materially false and

misleading because the Company's  subscriber count was artificially inflated by defendants'

- 8 -

failure to timely remove from the subscriber numbers those who had purchased a three-month,

pre-paid subscription to the WorldSpace "access control system" pursuant to a promotional offer

(the "1999 Promotion"), but who declined to continue, or to pay for, a subscription following the

end of the promotional period. Rather than report these expired subscriptions as "churned,"

defendants continued to include these expired subscriptions in the Company's subscriber count

for an additional 90 days following the expiration of the initial three-month promotional period.

27.     On September 7, 2005, WorldSpace issued a press release titled "WorldSpace

Announces Second Quarter 2005 Results." Therein the Company, in relevant part, stated:

> WASHINGTON, Sept. 7 /PRNewswire-FirstCall/-- WorldSpace, Inc.
> (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio
> services, today reported its financial and operating results for the second
> quarter ended June 30, 2005.
>
> During the second quarter 2005, WorldSpace continued the rollout of its
> service in key cities in India, including Bangalore, Chennai, and Hyderabad.
> As of June 30, 2005, WorldSpace had acquired 63,930 subscribers. This
> represented net subscriber additions of 11,427 for the quarter, an increase of
> 93 percent over the 5,936 subscribers added in second quarter of 2004.
>
> For the second quarter of 2005, WorldSpace reported quarterly revenues of
> approximately $2.3 million, representing a 21 percent increase compared with
> revenues of approximately $1.9 million for the second quarter of 2004.
> Subscriber revenue increased 390 percent to approximately $0.8 million for the
> second quarter of 2005 compared with subscriber revenue of approximately $0.2
> million for the second quarter of 2004.
>
> WorldSpace recorded a net loss for the second quarter 2005 of $22.0
> million or $0.95 per share compared with a net loss of $52.3 million or $9.04
> per share for the second quarter of 2004. WorldSpace had an EBITDA (earnings
> before interest income, interest expense, income taxes, depreciation and
> amortization) of $12.0 million for the second quarter 2005, compared with
> $10.0 million for the second quarter 2004.

Said Noah Samara, Chairman and Chief Executive Officer of WorldSpace, "The second quarter of 2005 was a critical time for WorldSpace as we prepared for our initial public offering, ramped up our marketing campaign in India and continued planning for the rollout of services in Western Europe and China -- markets where we enjoy a first-mover advantage. We also continued to form strategic partnerships and add new customer-driven content to our satellite radio offerings, especially in India, an under-served and highly attractive market for our products. Lastly, we continued to provide services to U.S. government agencies under existing contracts, all of which position us well for growth and expansion in the year ahead."

Accelerated Marketing Campaign and Expanded Presence in India
    WorldSpace ramped up its marketing campaign in 2005 after receiving funding at the end of last year. During the second quarter of 2005, its blended Cost per Gross Addition (CPGA) was $103, compared with $107 CPGA during the second quarter of 2004. Blended CPGA includes the fully-loaded cost to acquire each new subscriber in India and in our other markets such as western Europe, Africa and the Middle East, and includes Subscriber Acquisition Cost (SAC) and other marketing expenses such as advertising and point of sale materials. India CPGA during the three-month period ended June 30, 2005 was $175, compared with $94 for the second quarter of 2004, representing a significant ramp-up in marketing activities this year. WorldSpace's blended SAC for the second quarter of 2005 was $2.04 per subscriber, while the India SAC for the three-month period was $11.96 per subscriber.

Improved Liquidity

WorldSpace had total cash and cash equivalents of $83.3 million as of June 30, 2005.

Since then, WorldSpace has raised an additional net amount of approximately $244 million through an Initial Public Offering (IPO) and an investment by XM Satellite Radio Holdings, Inc. (XM). On August 9, 2005, WorldSpace completed its initial public offering of its Class A Common Stock of 11.5 million shares, raising a total of approximately $222 million in net proceeds for WorldSpace. On July 18, 2005, WorldSpace issued to XM 1,562,500 shares of Class A Common Stock for an aggregate purchase price of $25 million.

In connection with this transaction, WorldSpace entered into a global satellite radio cooperation agreement with XM pursuant to which the companies

agreed to cooperate on receiver technology, terrestrial repeater technology, original equipment manufacturer (OEM) and third-party distribution relationships, content opportunities and new applications and services. In addition, Gary Parsons, the Chairman of the board of directors of XM, was elected to the WorldSpace board of directors. In connection with this transaction, WorldSpace also granted to XM a performance-based warrant to purchase 1,785,714 shares of Class A Common Stock.

* * *

28.     On September 8, 2005, WorldSpace filed its quarterly report with the SEC on

Form 10-Q for second quarter 2005, the quarterly period ended June 30, 2005, which was signed

by the Individual Defendants and reaffirmed the Company's previously announced financial

results. Additionally, Pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed

by the Individual Defendants stating that the Form 10-Q did not include any material

misrepresentations.

29.     On November 7, 2005, WorldSpace issued a press release titled "WorldSpace

Announces Third Quarter 2005 Results; WorldSpace Finishes the Quarter with More Than

75,000 Subscribers, Grows Subscriber Revenue 232%." Therein the Company, in relevant part,

stated:

> SILVER SPRING, Md., Nov. 07, 2005 /PRNewswire-FirstCall via COMTEX News Network/ -- WorldSpace, Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today reported its financial and operating results for the third quarter ended September 30, 2005.
>
> WorldSpace finished the quarter with 75,071 subscribers. The Company added 11,141 subscribers in the third quarter this year, an increase of 78 percent over the 6,253 subscribers added in third quarter of 2004. In India, the Company has 35,670 subscribers at the end of the third quarter, of which 7,737 were added between July and September, an increase of 114% over the 3,616 added in the third quarter of 2004. In addition, WorldSpace added over 12,000 subscribers in India in October 2005 as part of its holiday marketing campaign.

- 11 -

At the end of the third quarter, WorldSpace distributed its satellite radio services to six cities in India, consisting of Mumbai, Delhi, Bangalore, Chennai, Hyderabad and Kochi. In addition services in Pune and Ahmedabad were launched in October. WorldSpace's market distribution is now available to a population of more than 50 million, including nearly 29 million households in the segment of the population that WorldSpace is targeting.

"During the third quarter we have made operational progress that puts us well on the path of delivering strong subscriber growth. This growth is clearly visible in our successful October holiday marketing campaign," said Noah Samara, WorldSpace's Chairman and CEO. "We have significantly increased our marketing and retail presence in key cities in India, expanded our content offering to further enhance an attractive value proposition to the consumer and improved our distribution. We continued to make progress in our business development activities in Europe and in addition in October, we obtained terrestrial repeater licenses in Dubai and Bahrain, the first terrestrial repeater licenses for mobile satellite radio outside of North America, and rolled out new marketing initiatives to the US military and government personnel stationed in our coverage area."

Quarterly Revenue Accelerates

For the third quarter of 2005, WorldSpace reported quarterly revenues of approximately $2.4 million, representing a 51 percent increase compared with revenues of approximately $1.6 million for the third quarter of 2004. Subscriber revenue increased 232 percent to approximately $1.0 million for the third quarter of 2005 compared with subscriber revenue of approximately $0.3 million for the third quarter of 2004.

Net Loss Narrows

WorldSpace recorded a net loss for the third quarter 2005 of $15.4 million or $0.48 per share, compared with a net loss of $57.3 million or $9.90 per share for the third quarter of 2004, a period that included $30.6 million in interest charges. WorldSpace had an EBITDA (earnings before interest income, interest expense, income taxes, depreciation and amortization) loss of $29.1 million for the third quarter of 2005, compared with an EBITDA loss of $12.1 million for the third quarter of 2004.

Accelerated Marketing Campaign

WorldSpace continued to ramp up its marketing campaign during the third quarter of 2005. During the third quarter of 2005, blended Cost Per Gross Addition (CPGA) was $407, compared with $128 CPGA during the third quarter of 2004. Blended CPGA includes fully-loaded cost to acquire each new subscriber in India and in its other markets and includes Subscriber Acquisition Costs and other marketing expenses such as advertising and point of sale materials. India CPGA during the three-month period ended September 30, 2005 was $508, compared with $97 for the third quarter of 2004, representing a significant ramp-up in marketing activities this year. WorldSpace's blended SAC for the third quarter of 2005 was $27 per subscriber, while the India SAC for the three-month period was $38 per subscriber. In the third quarter 2005, WorldSpace spent $4.9 million on advertising and marketing expenses, of which $4.1 million was spent in India. Improved Liquidity from IPO

WorldSpace had total cash, cash equivalents and marketable securities of $296.5 million as of September 30, 2005. This improved liquidity position resulted primarily from additional financing of approximately $244 million raised during the third quarter of 2005.

On August 9, 2005, WorldSpace completed its initial public offering (IPO) of its Class A common stock of 11.5 million shares, raising a total of approximately $221 million in net proceeds for WorldSpace.

On July 18, 2005, WorldSpace issued to XM Satellite Radio Holdings Inc. 1,562,500 shares of Class A Common Stock for an aggregate purchase price of $25 million. In connection with this transaction, WorldSpace entered into a global satellite radio cooperation agreement with XM pursuant to which both entities each agreed to cooperate with one another on receiver technology, terrestrial repeater technology, OEM and third party distribution relationships, content opportunities and new applications and services. In addition, Gary Parsons, Chairman of the Board of Directors of XM, was elected to the WorldSpace board of directors. In connection with the transaction, WorldSpace also granted to XM a performance-based warrant to purchase 1,785,714 shares of Class A Common Stock.

* * *

30.    On November 9, 2005, WorldSpace filed its quarterly report with the SEC on

Form 10-Q for third quarter 2005, the quarterly period ended September 30, 2005. The

Company's Form 10-Q reaffirmed the Company's previously announced financial results.

- 13 -

Pursuant to Sarbanes-Oxley, the Form 10-Q included certifications signed by the Individual

Defendants stating that the Form 10-Q did not include any material misrepresentations. In the

Sarbanes-Oxley certifications, the Individual Defendants made the following representations:

1.  I have reviewed this quarterly report on Form 10-Q for the quarter
    ended September 30, 2005 of WorldSpace, Inc.;

2.  Based on my knowledge, this report does not contain any untrue
    statement of a material fact or omit to state a material fact necessary to
    make the statements made, in light of the circumstances under which such
    statements were made, not misleading with respect to the period covered
    by this report;

3.  Based on my knowledge, the financial statements, and other
    financial information included in this report, fairly present in all material
    respects the financial condition, results of operations and cash flows of the
    registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for
    establishing and maintaining disclosure controls and procedures (as
    defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant
    and have:

    a)  Designed such disclosure controls and procedures, or
        caused such disclosure controls and procedures to be
        designed under our supervision, to ensure that material information
        relating to the registrant, including its consolidated subsidiaries, is
        made known to us by others within those entities, particularly
        during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure
        controls and procedures and presented in this report our
        conclusions about the effectiveness of the disclosure controls and
        procedures as of the end of the period covered by this report based
        on our evaluation; and

    c)  Disclosed in this report any change in the registrant's
        internal control over financial reporting that occurred during the
        registrant's most recent fiscal quarter (the registrant's fourth fiscal
        quarter in the case of an annual report) that has materially affected,

- 14 -

or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 9, 2005

31. On December 7, 2005, WorldSpace issued a press release titled "WorldSpace Satellite Radio Reaches 100,000 Subscribers; Subscribers Embrace WorldSpace's Exclusive Commercial-Free Content." Therein the Company, in relevant part, stated:

SILVER SPRING, Md., Dec. 7 /PRNewswire-FirstCall/ -- WorldSpace(R), Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, announced that it recently passed 100,000 subscribers globally -- reinforcing the company's execution against its business plan through the sequential roll out of services in key Indian and other global markets.

WorldSpace services have resonated with consumers across the world, especially in India where the company remains focused on building content and partner networks to increase visibility and drive consumer demand.

"Reaching 100,000 subscribers is an important milestone for WorldSpace and it reflects the effective implementation of our strategic plan, which is to leverage attractive market opportunities for our subscription services," said Noah Samara, chairman and CEO, WorldSpace. "We are very pleased with our progress and we

- 15 -

intend to continue aggressive sales and marketing efforts that will enable us to grow our subscriber base."

During 2005, WorldSpace has successfully launched roll-outs in nine cities in India, including Mumbai, New Delhi, Bangalore, Chennai, Hyderabad, Kochi, Pune, Ahmedabad and Chandigarh. Launching in these cities has enabled the company to access a population of approximately 29 million in its primary target market. As of September 30, 2005, WorldSpace services were available at approximately 550 retail locations in India.

As the only company licensed to offer satellite-based digital audio radio services (DARS) outside of North America, South Korea and Japan, WorldSpace delivers a continually growing line-up of exciting and diverse, commercial- free content to its international subscribers.

\* \* \*

32.     On January 25, 2006, WorldSpace issued a press release titled "WorldSpace Adds

a Record 40,000 Subscribers in the Fourth Quarter 2005." Therein the Company, in relevant

part, stated:

SILVER SPRING, Md., Jan. 25 /PRNewswire-FirstCall/ – WORLDSPACE(R), Inc., (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today announced that it finished 2005 with more than 115,000 subscribers globally. During the fourth quarter, WORLDSPACE added more than 40,000 net new subscribers, increasing its subscriber base by more than 50% in the fourth quarter alone.

"The growth rate demonstrates that we are delivering on our plan to drive subscriber growth in India. The value proposition of our offering is being validated by growing the demand for our service," said Noah Samara, chairman and CEO of WORLDSPACE. "We look forward to continue building on our success in 2005 and we are extremely excited about our plans to expand our service throughout India and other focus markets."

At the end of 2005, WORLDSPACE was offering the service in nine cities in India, including Mumbai, New Delhi, Bangalore, Chennai, Hyderabad, Kochi, Pune, Ahmedabad, and Chandigarh, covering a population of approximately 29 million through 650 retail locations and 550 direct sales force agents.

WORLDSPACE anticipates releasing its complete results for the fourth quarter of 2005 on March 16, 2006. Additional information on the timing of the release and the conference call will be announced shortly.

33.     On March 16, 2006, WorldSpace issued a press release titled "WorldSpace

Announces Fourth Quarter 2005 Results; WorldSpace Finishes 2005 With More Than 115,000

Subscribers Worldwide, Adds Over 40,000 New Customers in Fourth Quarter, Quarterly

Subscription Revenue Increases 160% from 2004" Therein the Company, in relevant part,

stated:

SILVER SPRING, Md., March 16, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- WorldSpace, Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today reported its financial and operating results for the fourth quarter and full year ended December 31, 2005.

WorldSpace finished the year with 115,306 subscribers. The Company added 40,235 subscribers in the fourth quarter of 2005, an increase of approximately 160% over the 15,545 subscribers added in fourth quarter of 2004. In India, the Company had 74,574 subscribers at the end of the fourth quarter of 2005, up over 100% from 35,670 at the end of the third quarter of 2005 and up nearly 800% from 8,335 at the start of the year.

At the end of the fourth quarter of 2005, WorldSpace had rolled out its satellite radio services in nine cities in India -- Mumbai, Delhi, Bangalore, Chennai, Hyderabad, Kochi, Pune, Ahmedabad and Chandigarh. Service in Kolkata, India's second largest city, was launched in February 2006. WorldSpace's market distribution is now available to a population of nearly 63 million, including nearly 35 million people in the top three economic segments targeted by the Company.

"WorldSpace made important progress against all of our key operational metrics during the fourth quarter of 2005, especially in delivering strong subscriber growth," said Noah Samara, chairman and chief executive officer, WorldSpace. "We believe we have gained significant traction in our efforts to acquire new subscribers, and will continue to do so as our visibility and brand awareness grow with the roll-out of our service to additional metropolitan areas, supported by targeted marketing campaigns. We also have made great strides in building our senior management teams, internationally and at the corporate level, by adding

- 17 -

quality people with key areas of expertise that will be critical to our forward momentum."

WorldSpace's 2005 highlights

* Added over 80,000 new subscribers during the year, growing global subscriber base to over 115,000 subscribers at year end 2005;

* Added over 66,000 new subscribers in India during the year, including 40,000 subscribers following the launch of a major marketing and promotional campaign in the fourth quarter of 2005;

* Introduced 19 new programming channels, including the first India sports talk radio channel and many regional language channels in India, as well as the world's first global hip hop channel, bringing the total number of channels broadcast on WorldSpace's global system to 220 by the end of the year;

* Completed an initial public offering (IPO) in August 2005, raising net proceeds of approximately $221 million;

* Raised strategic capital from and formed a technology sharing partnership with XM Satellite Radio in July 2005, including an investment of $25 million by XM Satellite Radio. Also, three-year warrants valued at $37.5 million were issued to XM Satellite Radio exercisable at the IPO price provided XM has made substantial technological contributions to WorldSpace, including in the areas of products, chipsets and terrestrial repeater development and deployment;

* Continued the expansion of our distribution and geographic presence in India, with over 650 retail points of presence in nine cities at the end of the year covering approximately 30 million people in WorldSpace's target market segment of the India population;

* Obtained terrestrial repeater licenses in United Arab Emirates and Bahrain, the first L-band terrestrial repeater licenses for satellite radio.

Noah Samara said, "2006 is a pivotal year for WorldSpace. We are working hard to gain key regulatory approvals for the delivery of mobile services in certain of our markets, and to increase the variety of our receivers. We are moving into more cities in India and we are gaining strength in other countries where subscribers can be added at little incremental cost. We started the year well with the FCC's approval of our license application for our Afristar-2 satellite, which when launched, will enable us to broaden our offerings in Europe and the Middle East."

- 18 -

Revenue Continues to Accelerate

For the fourth quarter of 2005, WorldSpace reported quarterly revenues of approximately $4.4 million, representing 95% increase compared with revenues of approximately $2.3 million for the fourth quarter of 2004. Subscription revenue increased approximately 160% to approximately $1.1 million for the fourth quarter of 2005 compared with subscription revenue of approximately $0.4 million for the fourth quarter of 2004. On an annual basis, total revenues for 2005 were $11.7 million in 2005, a 36% increase over 2004 total revenues of $8.6 million. Subscription revenue in 2005 was $3.7 million, a 255% increase over $1.0 million in 2004.

Net Loss Narrows

WorldSpace recorded a net loss for the fourth quarter 2005 of $33.2 million, or $0.90 per share, compared with a net loss of $418.2 million, or $71.45 per share for the fourth quarter of 2004, a period that included stock compensation expenses and other costs associated with an inter-company consolidation and subsequent debt restructuring. WorldSpace had an EBITDA (earnings before interest income, interest expense, income taxes, depreciation and amortization) loss of $44.9 million for the fourth quarter of 2005, compared with an EBITDA loss of $101.0 million for the fourth quarter of 2004.

For the full year 2005, the Company's net loss was $79.9 million, or $2.77 per share, compared to a net loss of $577.4 million, or $99.00 per share in 2004. The EBITDA loss in 2005 was $84.6 million, compared to an EBITDA loss of $130.1 million in 2004.

CPGA Declines

Cost per Gross Addition (CPGA) during the fourth quarter of 2005 was $172 compared with $407 in the third quarter of 2005. CPGA in India declined from $508 in the third quarter 2005 to $154 in the fourth quarter. WorldSpace's Subscriber Acquisition Cost (SAC) for the fourth quarter of 2005 was $43 per subscriber, while the India SAC for the three-month period was $43 per subscriber; for the third quarter of 2005, these amounts were $27 for global SAC and $38 for India SAC, respectively. In the fourth quarter of 2005, WorldSpace spent approximately $9.6 million on sales, marketing and subscriber acquisition expenses globally, including $8.0 million in India compared with $4.9 million and $4.1 million respectively in the third quarter of 2005.

* * *

34.     That same day, March 16, 2006, during a conference call with analysts, the

Company revealed that service to subscribers was not immediately discontinued when a customer

failed to renew its subscriptions, as indicated in the following exchange:

> **Q:** [Cowen & Co. analyst] **TOM WATTS:** In terms of your previous 1999 promotions that you began in was is October I believe, that included three month pre-payment of service. What sort of renewal rates have you seen at the end of the three months as people started roll off of that? How does -- can you just talk about the process of getting people to start paying on a regular basis?

> **A:** [CFO] **SRIDHAR GANESAN:** Sure. As you know, as you know all, we launched this three months promotional campaign in the first half of October 2005. It was a very successful campaign. We added about 39,000 subscribers just in the fourth quarter after we launched that campaign in India. We have begun to see renewals and disconnect from that promotional campaign beginning to happen now.

> *Well, well we disconnect subscribers when we change passwords. And right now we changed passwords every 90 days. And so we can really get the true estimate of renewals as well as the return from that promotional campaign only at the -- when we actually disconnect these -- when we change the passwords.*

> We are addressing that from a technological perspective so we can disconnect people earlier and get to these kinds of estimates earlier. But that is the case. But what I can tell you is that we did do a customer satisfaction survey after we launched the promotional campaign. And as Noah said 97% of those surveyed said that they would recommend the service to others or have already recommended. Another 94% are very satisfied with the, with the content and the service. And then the mid 70% they said that they'll renew the service based upon a certain pricing plan. And that number goes up based upon multi year plans that we maybe able to offer as well.

> *So right now we cannot give you the right -- exact variable numbers or the general numbers.* But clearly the satisfaction surveys show that it's a question of execution and we are executing right now. We've got a renewal plan in place. Our team in India are working hard, making all the contacts that they have make to get these subscribers renewed.

> **TOM WATTS:** And when does the next password change?

> **SRIDHAR GANESAN:** End of this month.

[Emphasis added.]

- 20 -

35.     This news shocked the market, causing shares of WorldSpace to plummet the next day, March 17, 2006, by $2.63 per share – a more than 22% drop from the previous day's closing price of $11.52 per share.  During the next two trading days, WorldSpace shares plummeted even further, falling 16% on March 20, 2006, and 20% the next day, to close on March 21, 2006, at $5.95 per share.

36.     One week later, in a report published by SG Cowen & Co. on March 24, 2006, analysts Tom Watts and Shaun Parvez provided a customer timeline illustrating how WorldSpace continued to include churned customers in the Company's subscriber count past the date when the customer should be counted as churned and until the next quarterly passcode change, stating in relevant part as follows:

**First Churn Datapoint in Early May, Complicated by Password-Based System**

Because of the Company's current access control system and it current grace period practices, it has not yet developed enough data to estimate churn.  The company should be able to report preliminary data for customers that joined in October by its Q1 call, which we expect in early May.  To understand the subscriber churn cycle, we have provided an illustrative customer timeline below:

**Illustrative Customer Timeline**

| October 10 | Customer purchases system and 3-month pre-paid subscription |
|---|---|
| October 15 | System installed. 3-month subscription period begins |
| December 15 | Customer receives bill for renewal one month before end of subscription, with renewal options of 6 months, 1 year or 2 years. |
| January 1 | Phone call to customer 2 weeks prior to end of |

| | subscription regarding renewal |
|---|---|
| **January 15** | Subscription expires. 60-day grace period begins. |
| **January 15 -March 31** | Phone calls, door-to-door visits, mail contacts attempt to renew customer. |
| **March 15** | Grace period ends. *Customer should be counted as churned. However, password system prevents customer turn-off.* [Emphasis added.] |
| **March 31** | WorldSpace undertakes quarterly password change. Shuts off non-paying customers |
| **March 31- April 15** | WorldSpace attempts to renew customer now that service has been shut-off. We do not know how long after that shut-off WorldSpace counts the customer as churned. |
| **Early May** | WorldSpace reports churn statistics for customers that purchased the system in October. |

As illustrated by the time line above, WorldSpace's current password-based system and its constraint that it can only reset passwords once quarterly, complicates that churn calculation.  It also means that even by May, the company will not have churn data for any customers that signed up after October 31, since a November 1 customer's grace period would not end until April 1, and his password could not be changed until June 30.

By the company's Q2 call, it should be able to provide reliable churn data for all the customers that joined in Q4:05.

The company plans to introduce next generation receivers in Q2 that enable real-time over-the-air access control authorization and de-authorization. That should simplify churn management significantly. *Until then, the current password-based system will enable a number of non-paying free riders to continue to receive WorldSpace programming for free during the period after the expiration of their grace period., but before the next password re-set.*

\* \* \*

37.    Approximately six weeks later, on May 9, 2006, the Company held its Q2

- 22 -

conference call with analysts to discuss the Company's second quarter 2006 financial results.

The Company's CFO, defendant Ganesan – in response to a question by analyst Tom Watts –

admitted that the Company's subscriber count included subscriptions which were expired but not

yet disconnected, in the following exchange:

> Q: [SG Cowen & Co. analyst] TOM WATTS: Just-- I know you were doing
> quarterly shut-offs. You did one in March and another in – was it June 30 that you
> did that? *And did that – the number that we include, does that exclude people
> who are shut off as of the June 30th shut-off date, or are many of those people
> still in the grace period?*
>
> A: [WorldSpace CFO] SRIDHAR GANESAN: The standard-- I told you that the
> average grace period was 60 days. And we apply that, and at the end of it, people
> get shut off. *So the end-of-period subscribers on June 30th <u>will include those
> that are within that grace period</u> as well.* Does that answer your question?
>
> WATTS: Anyone who's beyond 60 days was not included in the subscriber count
>
> GANESAN: It's not included; it's not included in the subscriber count; that's right.
>
> TOM WATTS: And if they happen to be over 60 days as of June 30th, they would
> have been shut off -- is that correct?
>
> SRIDHAR GANESAN: In our-- as far as subscriber count is concerned, yes,
> absolutely. *Till we fix the technology issue, those that are still remaining, even
> beyond the grace period, so until we change the password, they will continue to
> get the service.*

[Emphasis added]

## COUNT I

### Violations Of Section 11 Of The Securities Act
### <u>Against All Defendants</u>

38.   Plaintiff repeats and realleges each and every allegation above as if set forth

fully herein, excluding all allegations above that contain facts necessary to prove any elements

- 23 -

not required to state a Section 11 claim, including without limitation, scienter. This Count is

brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k. This claim is not based on

and does not sound in fraud.

      39.    This claim is brought by Plaintiff on his own behalf and on behalf of other

members of the Class who acquired WorldSpace stock pursuant to the Prospectus and

Registration Statement. Each Class member acquired their shares pursuant to and/or traceable to,

and in reliance on, the Prospectus and Registration Statement. WorldSpace is the issuer of the

securities through the Registration Statement and Prospectus. The Individual Defendants are

signatories of the Registration Statement and Prospectus. UBS and Cowen are underwriters of

the securities offered through the Registration Statement and Prospectus.

      40.    Defendants owed to the purchasers of the stock obtained through the Registration

Statement and Prospectus the duty to make a reasonable and diligent investigation of the

statements contained in the Registration Statement and Prospectus at the time they became

effective to ensure that such statements were true and correct and that there was no omission of

material facts required to be stated in order to make the statements contained therein not

misleading.

      41.    None of the defendants made a reasonable investigation or possessed reasonable

grounds for the belief that the statements contained in the Registration Statement and Prospectus

were true or that there was no omission of material facts necessary to make the statements made

therein not misleading.

42.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts set forth above. By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

44.     WorldSpace is the issuer of the stock sold via the Registration Statement and Prospectus. As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

45.     At the times they obtained their shares of WorldSpace, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

46.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

47.     By virtue of the foregoing, plaintiff and the other members of the class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation above as if set forth

fully herein, excluding all allegations above that contain facts necessary to prove any elements

not required to state a Section 12 claim, including without limitation, scienter.  This Count is

brought for violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), against all

defendants, each of whom offered and sold WorldSpace common stock to the Class in the Initial

Public Offering by means of the Registration Statement and Prospectus. This claim is not based

on and does not sound in fraud.

49.     As set forth more specifically above, the Registration Statement and Prospectus

included untrue statements of material fact and omitted to state material facts necessary in order

to make the statements, in light of the circumstances in which they were made, not misleading.

50.     Lead Plaintiff and the members of the Class did not know, nor could they have

known, of the untruths or omissions contained in the Registration Statement and Prospectus.

51.     The defendants named herein were obligated to make a reasonable and diligent

investigation of the statements contained in the Registration Statement and Prospectus to ensure

that such statements were true and that there was no omission of material fact required to be

stated in order to make the statements contained therein not misleading. None of the defendants

named in this Count made a reasonable investigation or possessed reasonable grounds for the

belief that the statements contained in the Registration Statement and Prospectus were accurate

and complete in all material respects.

- 26 -

52.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after the WorldSpace common stock was sold to the Class in connection with the Initial Public Offering.

53.    By reason of the misconduct alleged herein, the defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to plaintiff and the members of the Class who purchased or acquired WorldSpace common stock in the Initial Public Offering, each of whom has been damaged as a result of such violations.

54.    Plaintiff and the members of the Class who purchased WorldSpace common stock in the Initial Public Offering hereby seek rescission of their purchases and hereby tender to the defendants named in this Count the common stock, which Lead Plaintiff and other members of the Class continue to own, in return for the consideration paid for those securities, together with interest thereon.

## COUNT III

### Violations of Section 15 of The Securities Act
### Against Defendants Samara and Ganesan

55.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.  This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o. This claim is not based on and does not sound in fraud.

56.    This claim is asserted against the Individual Defendants, each of whom was a

- 27 -

control person of WorldSpace during the relevant period.

57.     For all the reasons set forth above in Count One, above, WorldSpace is liable to plaintiff and the members of the Class who purchased WorldSpace common stock on the IPO based on the untrue statements and omissions of material fact contained in the Registration Statement and Prospectus, pursuant to Section 11 of the Securities Act, and were damaged thereby.

58.     Defendants Samara and Ganesan were control persons of WorldSpace by virtue of, among other things, their positions as senior officers of WorldSpace, and they were in positions to control and did control the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

59.     Neither Samara nor Ganesan made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

60.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after the WorldSpace common stock was sold to the Class in connection with the Initial Public Offering.

61.     By reason of the misconduct alleged herein, for which WorldSpace is primarily liable, as set forth above, defendants Samara and Ganesan are jointly and severally liable with and to the same extent as WorldSpace, pursuant to Section 15 of the Securities Act.

- 28 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself the other members of the Class, pray for judgment as follows:

(a)  declaring this action to be a Plaintiff class action properly maintained pursuant to the Maryland Rules of Civil Procedure, certifying the Class, and certifying their counsel as Class Counsel;

(b)  awarding Plaintiff and other members of the Class damages against Defendants, jointly and severally, together with interest thereon;

(c)  awarding Plaintiff and the other members of the Class rescission on Count II to the extent they still hold WorldSpace common stock, or if sold, awarding rescissory damages in accordance with Section 12(a)(2) of the Securities Act;

(d)  awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

(e)  awarding Plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 15, 2007

**LABATON SUCHAROW & RUDOFF LLP**

By: _____

Christopher J. Keller (CK-2347)
Eric I. Belfi (EB-8895)
Andrei V. Rado (AR-3724)
Alan I. Ellman (AE-7347)
100 Park Avenue, 12th Floor
New York, NY 10017
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160

Attorneys for Plaintiff

**Exhibit A**

**GLANCY BINKOW & GOLDBERG LLP**
**SWORN CERTIFICATION OF PLAINTIFF**
**WORLDSPACE CORPORATION SECURITIES LITIGATION**

I, ___LARRY   PATEL_____, certify that:
(Please Print Your Name)

1.      I have reviewed the Complaint and authorized its filing.

2.      I did not purchase WORLDSPACE CORPORATION, the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in WORLDSPACE CORPORATION during the Class Period set forth in the Complaint are as follows:

I bought _____ shares on ___/___/___ at $ ____ per share
I bought _____ shares on ___/___/___ at $ ____ per share
I bought _____ shares on ___/___/___ at $ ____ per share
I bought _____ shares on ___/___/___ at $ ____ per share

I sold  _____ shares on ___/___/___ at $ ____ per share
I sold  _____ shares on ___/___/___ at $ ____ per share
I sold  _____ shares on ___/___/___ at $ ____ per share
I sold  _____ shares on ___/___/___ at $ ____ per share

(List Additional Transactions On Separate Page If Necessary)

5.      I have not served as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

☐ Check here if you are a current employee or former employee of the defendant Company.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _9|22|06_                          _____
                                          (Please Sign Your Name Above)

**EXHIBIT A**

**Transactions of Larry Patel in Worldspace Corporation**

| TRANSACTION DATE | TRANSACTION TYPE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 08/04/05 | PURCHASE | 700 | $21.00 |
| 09/01/06 | SALE | 700 | $2.20 |

Page 1 of 1