USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/21/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
:
In re WORLDSPACE SECURITIES          :       07 Civ. 2252 (RMB)
LITIGATION                           :
:       **DECISION AND ORDER**
:
:
:
------------------------------------------------------------x

**I.    Introduction**

This consolidated securities law action was initiated on March 15, 2007 on behalf of a putative class of persons ("Plaintiffs" or "Class") who purchased the securities of WorldSpace, Inc. ("WorldSpace" or "Company") "pursuant and/or traceable to the Company's initial public offering ["IPO"] on or about August 4, 2005 through March 16, 2006 ["Class Period"]."[1] (Am. Class Action Compl., dated August 9, 2007, ¶ 1.) On August 9, 2007, Lead Plaintiff Midtown Partners III, LLC ("Midtown Partners") filed a complaint ("Complaint") asserting claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, against WorldSpace and certain of its officers, including Noah A. Samara ("Samara"), the Company's Chairman and Chief Executive Officer ("CEO"), and Sridhar Ganesan ("Ganesan"), the Company's Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), and underwriters UBS Securities LLC ("UBS") and Cowen & Co., LLC ("Cowen") (collectively, "Defendants"). Plaintiffs allege, among other things, that the registration statement ("Registration Statement") and prospectus ("Prospectus") issued in connection with the WorldSpace IPO "materially overstated the number of subscribers to the

---

[1] By Order dated June 21, 2007, five related securities actions filed against WorldSpace were consolidated "pursuant to Rule 42(a) of the Federal Rules of Civil Procedure under the caption 'In re WORLDSPACE SECURITIES LITIGATION.'"

Company's [satellite radio] service" and "failed to disclose that the Company lacked the internal systems necessary to accurately determine the number of subscribers to its service." (Compl. ¶ 28.)

On October 9, 2007, Defendants jointly moved to dismiss the Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing, among other things, that: (1) Plaintiffs were "on inquiry notice of their claims at least by December 30, 2005" but "did not bring this action . . . until March 15, 2007, <u>after</u> the one year-statute of limitations period had expired"; (2) claims under 15 U.S.C. §§ 77k and 77l(a)(2) ("Section 11" and "Section 12(a)(2)", respectively) "that 'sound in fraud' must satisfy the particularity requirements of [Federal Rule of Civil Procedure] 9(b)" and Plaintiffs "have failed to satisfy [such] heightened pleading requirements"; (3) "Plaintiffs fail to plead that the [Registration Statement and Prospectus] contained a misstatement or omission" or that the alleged misstatement or omission "was material" under Section 11 or Section 12(a)(2); and (4) "[h]aving failed to allege any primary violation of the Securities Act, Plaintiffs cannot state a claim for control person liability under" 15 U.S.C. § 77o ("Section 15"). (Mem. of Law in Supp. of Defs. Joint Mot. to Dismiss the Compl., dated Oct. 9, 2007 ("Defs. Mem."), at 2–3, 7–8 (emphasis in original).)

On November 15, 2007, Plaintiffs filed an opposition arguing, among other things, that: (1) "[p]rior to March 16, 2006, Plaintiff[s were] unaware that WorldSpace could not accurately determine the number of its subscribers or its churn rate – and had no reason to suspect that the Company had no such ability"; (2) "the Complaint never mentions the word 'fraud', does not contain any fraud-based claims and is predicated solely on negligence," and is "reviewed under the notice pleading standard of [Federal Rule of Civil Procedure] 8(a), which it easily satisfies"; (3) the Registration Statement and Prospectus "materially overstated the actual number of

subscribers to the Company's service as of June 30, 2005" and "given the allegations of the Complaint, the inability to accurately determine the number of paying subscribers was known and was having a negative impact on the Company's continuing operations – thereby mandating disclosure"; and (4) Plaintiffs have "more than sufficiently pleaded Section 11 claims" to establish control person liability under Section 15 against Samara and Ganesan. (Mem. of Law in Opp'n to Defs. Joint Mot. to Dismiss the Compl., dated Nov. 15, 2007 ("Pls. Mem."), at 2, 8, 12–13, 16–17.)

On December 14, 2007, Defendants filed a reply. (Reply Mem. of Law in Further Supp. of Defs. Joint Mot. to Dismiss the Compl. ("Reply Mem."), dated Dec. 14, 2007.) Oral argument was held on July 17, 2008 at 10 a.m. (See Transcript of Oral Argument, dated July 17, 2008 ("Transcript").)

**For the following reasons, Defendants' joint motion to dismiss the Complaint is denied.**

## II. Background

For the purposes of this motion, the allegations of the Complaint are taken as true. Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).

WorldSpace "designs, develops, constructs, deploys and finances satellite-based radio and data broadcasting service primarily in India and China," and "purports to offer various international, national, and regional radio programming services, which include music, news, and entertainment channels." (Compl. ¶ 22.) Samara "is, and was at all times relevant hereto, the Company's Chairman and [CEO]" and "signed the Registration Statement." (Compl. ¶ 10.) Ganesan "is, and was at all times relevant hereto, the Company's [EVP] and [CFO]" and "signed the Registration Statement." (Compl. ¶ 11.) UBS "was an underwriter and the sole

3

book-running manager of the IPO." (Compl. ¶ 13.) Cowen "was an underwriter of the IPO." (Compl. ¶ 14.)

In order to receive WorldSpace satellite radio broadcasts, a subscriber "must purchase a receiver which processes, decodes and descrambles the signals to allow users to receive the encrypted programming content." (Compl. ¶ 23.) "A 'passcode' is provided to a subscriber . . . and allows the subscriber to use the receiver" and listen to the satellite radio service. (Id.) WorldSpace changes the passcodes every ninety days. (See Compl. ¶ 34.)

"[B]efore [WorldSpace] disconnect[s] a [non-paying] subscriber", WorldSpace allows an average grace period of 60 days "after the end of [a] subscription." (Compl. ¶ 37.) Any subscriber with a delinquent account "beyond 60 days", is "not included in the subscriber count." (Compl. ¶ 38.) Some WorldSpace subscribers, "even those beyond the grace period" "will continue to get the [satellite radio] service", until WorldSpace resets the subscriber's passcode. (Id.) As a result, a subscriber may "continue to obtain service even if the subscriber has stopped paying for the service until the passcode is changed by WorldSpace." (Compl. ¶ 23.)

"On August 5, 2005, the [P]rospectus, which forms part of the Registration Statement, was declared effective and WorldSpace sold 11,868,400 shares of Class A common stock for $21.00 per share, raising a total of approximately $249 million." (Compl. ¶ 26.)

The Prospectus states, in relevant part, that WorldSpace's "ultimate profitability and the timing and extent of any need for additional capital resources are materially dependent of the ability to generate our revenue through substantial increases in subscribers, among other factors." (Compl. ¶ 30.) The Prospectus also states that "subscription revenue has become an increasingly significant component of our revenue. We expect that subscription fees will be the main source of revenue for the Company in the future . . . ." (Id.)

4

Plaintiffs allege that during a November 7, 2005 analyst conference call, "Ganesan refused to provide information concerning the Company's churn rate," stating that "we are at an early stage that we cannot – we are not going to give any guidance on [subscriber] churn. We are rolling out in different cities . . . specific guidance at this point, whether it is churn or subscribers is – it's just too early." (Compl. ¶ 32.) The following day, "the Company's stock price dropped from $12.30 per share to a closing price of $10.93 per share and to a closing price of $10.37 per share on November 9, 2005, trading on heavier than usual volume." (Compl. ¶ 33.)

Plaintiffs also allege that during a call with analysts on March 16, 2006, "the Company revealed that service to subscribers was not promptly discontinued when a customer failed to renew its subscription." (Compl. ¶ 34.) Ganesan stated: "we disconnect subscribers when we change passwords . . . And so we can really get the true estimate of renewals as well as the return from that promotional campaign only at the – when we actually disconnect these – when we change the passwords." (Id.) He continued: "[s]o right now we cannot give you the right – exact variable numbers or the general numbers . . . ." (Id.) Samara also stated that WorldSpace was "changing the technology" so it "can [shut-off a non-renewing subscriber's service] on an individual basis." (Id.) In the days following this call, WorldSpace's stock price dropped from a closing price of $11.52 per share on March 16, 2006 to a closing price, on March 21, 2006, of $5.95 per share. (Compl. ¶ 35.)

The Prospectus states, "[a]s of June 30, 2005, [WorldSpace] had more than 63,000 paying subscribers." (Compl. ¶ 29.) The Complaint alleges that "[t]his statement was an inaccurate statement of material fact because it materially overstated the actual number of subscribers to the Company's service as of June 30, 2005." (Compl. ¶ 29.) The Complaint

5

alleges also that the Prospectus failed to "disclose that the Company was unable to determine at any given point of time how many subscribers it had to its service" in order to make the subscriber figures cited in the Prospectus not misleading. (Compl. ¶ 30.)

### III.   Legal Standard

"In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); accord Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007). "The Court's task is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 623 (S.D.N.Y. 2007) (internal quotations and citation omitted.) At the same time, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal quotations and citation omitted); see also ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 n.2 (2d Cir. 2007). "[P]laintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Comms., 493 F.3d at 98 (quoting Twombly, 127 S. Ct. at 1965); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (Twombly "requir[es] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.").

IV.  **Analysis**

(1)  **Statute of Limitations**

Defendants argue, among other things, that Plaintiffs were put "on inquiry notice of their claims by December 30, 2005, at the very latest, through numerous public statements both by the Company and by analysts." (Defs. Mem. at 15.) Plaintiffs counter, among other things, that "[p]rior to March 16, 2006 [the date of a WorldSpace analyst call], Plaintiff[s were] unaware that WorldSpace could not accurately determine the number of its subscribers or its churn rate – and had no reason to suspect that the Company had no such ability." (Pls. Mem. at 17.)

Defendants have not satisfied the "heavy burden" to establish that Plaintiffs were "on inquiry notice as a matter of law" (on or before December 30, 2005) of Defendants' alleged securities law violations.[2] Adams v. Intralinks, Inc., No. 03 Civ. 5384, 2004 WL 1627313, at *5 (S.D.N.Y. July 20, 2004); see also In re Polaroid Corp. Sec. Litig., 465 F. Supp. 2d 232, 246 (S.D.N.Y. 2006) ("[T]he U.S. Court of Appeals for the Second Circuit has stressed the caution with which courts must approach the inquiry notice question on a motion to dismiss.") (internal citations omitted). For example, neither Defendants' statement that "we are not going to give any guidance on churn" during the November 7, 2005 conference call (Compl. ¶ 32), nor the lack of "definitive visibility into churn" referred to in the Bear Stearns analyst reports, dated December 22, 2005 and December 30, 2005, constitutes "uncontroverted evidence irrefutably demonstrat[ing] when [Plaintiffs] discovered or should have discovered" alleged impropriety with respect to the subscriber figures set forth in the Prospectus. Adams, 2004 WL 1627313, at *5; (Defs. Mem. at 18); see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier,

---

[2]  "A person is said to be on inquiry notice [of a Section 11 violation] where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded." Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 701 (2d Cir. 1994) (internal quotations and citation omitted).

7

Inc., No. 05 Civ. 1898, 2005 WL 2148919, at *8–9 (S.D.N.Y. Sept. 6, 2005) ("A close reading of the [analyst] reports cited by defendants in support of their claim of inquiry notice reveals that few of the facts necessary to establish plaintiff's core claims are found in those reports.").

### (2)  Pleading Standard

Defendants argue, among other things, that "Section 11 and Section 12(a)(2) claims that 'sound in fraud' 'must satisfy the particularity requirements of [Federal Rule of Civil Procedure] 9(b)." (Defs. Mem. at 7.) Plaintiffs counter, among other things, that, their claims "do not require the assertion of fraud, knowledge or reckless disregard of known facts as an element of the claims" and "the Complaint [does not] make any such allegations." (Pls. Mem. at 13–14.) Rather, the Complaint "is predicated solely on negligence" and alleges "claims . . . for which fraud is not an element." (Id. at 2, 14.)

The United States Court of Appeals for the Second Circuit "has acknowledged that 'fraud is not an element or a requisite to a claim under Section 11,' and that 'a plaintiff need allege no more than negligence to proceed under Section 11.'" In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 631 (quoting Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)). "The heightened pleading standard of [Federal Rule of Civil Procedure] 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud." Rombach v. Chang, 355 F.3d at 171. The appropriate pleading standard for Section 11 and 12(a)(2) claims "necessarily requires a case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'" In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 632 (citing Rombach, 355 F.3d at 172).

Plaintiffs' Complaint alleges, among other things, that Defendants owed Plaintiffs a "duty to make a reasonable and diligent investigation of the statements contained in the

[Registration Statement and Prospectus]" and the Registration Statement and Prospectus were "negligently prepared," resulting in alleged material misstatements and omissions. (Compl. ¶¶ 27, 42, 51, 60.) Plaintiffs' claims "[a]s to the [D]efendants' intent . . . are carefully couched in the language of negligence," In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 632, and Defendants' motion to dismiss the Complaint based upon Plaintiffs' "failure to satisfy [Federal Rule of Civil Procedure] 9(b)'s standards [is] denied." Id. at 633.

### (3)     Section 11 and 12(a)(2) Claims

Defendants argue, among other things, that Plaintiffs fail to state a claim under Sections 11 and 12(a)(2) because "none of the alleged misstatements and omissions identified in the [Complaint] relate to the Company's ability to calculate its subscribers or 'churn rate' <u>at the time of the IPO</u>" and that Plaintiffs "do not allege that the Company miscounted its subscribers by a number significant enough [i.e., material] to matter to investors." (Defs. Mem. at 9, 13) (emphasis in original.) Plaintiffs counter, among other things, that WorldSpace "admitted that its subscription figures include subscribers who have stopped paying for service"; Defendants' "statements about subscription figures and their importance to the Company created an obligation to disclose" that "at the time of the IPO WorldSpace lacked the ability to accurately determine the number of paying subscribers to its service"; and "it cannot be reasonably disputed that such information would be material to investors." (Pls. Mem. at 8–11); see, e.g., supra p. 4 (WorldSpace's "ultimate profitability and the timing and extent of any need for additional capital resources are materially dependent of the ability to generate our revenue through substantial increases in subscribers, among other factors." (Compl. ¶ 30)).

"To allege a claim under Section 11 of the Securities Act, a plaintiff need show that a registration statement: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a

9

material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statement therein not misleading.'" In re Morgan Stanley and Van Kampen Mut. Fund Secs. Litig., No. 03 Civ. 8208, 2006 WL 1008138, at *6 (S.D.N.Y. Apr. 14, 2006) (quoting 15 U.S.C. § 77k). To establish a claim under Section 12(a)(2), "a plaintiff must prove that (1) defendants sold or offered a security (2) by means of a prospectus (3) that included an untrue statement of material fact or omitted a material fact necessary to make such statements not misleading." Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 610 (S.D.N.Y. 2008) (citing 15 U.S.C. § 77l(a)(2)).[3]

Plaintiffs have alleged, among other things, that the Registration Statement and Prospectus "materially overstat[ed] the actual number of subscribers to [WorldSpace's] service as of June 30, 2005" by including in the subscriber count "subscriptions which were expired but not yet disconnected." (Compl. ¶¶ 29, 38.) Plaintiffs also allege that the Registration Statement and Prospectus were "required to disclose[]," but did not, that "WorldSpace lacked the ability to accurately determine the number of paying subscribers to its service and, therefore, was unable to accurately gauge how much of its subscriber fee revenue would continue to be paid on a timely basis, if at all." (Compl. ¶ 31.) "The Prospectus represented that the Company's continued viability was critically dependant on the acquisition and retention of a large subscriber base." (Compl. ¶ 30.)

"Viewed as a whole, the allegations are sufficient to raise a right to relief above the speculative level." In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 291 (S.D.N.Y. 2004) (internal quotations and citations omitted); see also In re Adelphia Commc'ns Corp. Secs.

---

[3]   There is little or no dispute that on or about August 5, 2005 WorldSpace sold 11,868,400 shares of Class A WorldSpace common stock by means of the Prospectus. (Defs. Mem. at 4; Compl. ¶ 26); see also Compl. ¶ 26.

10

and Derivative Litig., 03 MD 1529, 2007 U.S. Dist LEXIS 66911, at *24 (S.D.N.Y. Sept. 10, 2007) ("Whether Plaintiffs' losses owed to their investment strategy or to the [alleged] misstatements and omissions they cite is a question of fact, and no motion to dismiss can thus be granted on these grounds.")

"[W]hen presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 636 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)). The alleged misstatements and omissions here regarding the problems with WorldSpace's subscriber count system could very well have affected investment decisions. In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d at 211 (S.D.N.Y. 2004); (see Transcript; Compl. ¶ 28 (An accurate subscriber count "would be necessary to gauge the health and success of the Company's business.")); see also In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 202 F. Supp. 2d 8, 11 (S.D.N.Y. 2001) ("Disclosure of pending disconnections and the incomparability of [the Company's] reported churn rate with other carriers would likely have affected the 'total mix' of information available to investors.")

(4)  **Control Person Claims**

Defendants argue, among other things, that because "[P]laintiffs here fail to allege that WorldSpace committed a primary violation under [Section 11 or Section 12(a)(2)] of the Securities Act," Plaintiffs "therefore fail to state a claim for control person liability against Samara and Ganesan." (Defs. Mem. at 15.) Plaintiffs counter, among other things, that "Plaintiff[s have] more than sufficiently pleaded Section 11 [and Section 12(a)(2)] claims" and

11

"Defendants do not challenge that Plaintiff[s have] sufficiently alleged [Samara's and Ganesan's] control over [WorldSpace]." (Pls. Mem. at 23-24.)

In order to state a claim for control person liability under Section 15, "a plaintiff must allege '(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator.'" In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007) (quoting In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 637). "Defendants' only challenge to [P]laintiffs' Section 15 . . . claims is that [P]laintiffs have not adequately stated primary violations of the securities laws and that, accordingly, the Section 15 . . . claims are inadequate." In re AnnTaylor Stores Sec. Litig., 807 F. Supp. 990, 1002 (S.D.N.Y. 1992). Since the court has found that Plaintiffs have adequately pled their claims under Sections 11 and Section 12(a)(2), Defendants' motion to dismiss on this basis is denied. Id.

## V. Conclusion and Order

For the foregoing reasons, Defendant's motion to dismiss Plaintiffs' Complaint [#40] is denied.

The parties are directed to appear at a status/scheduling conference with the Court on July 30, 2008 at 9:30 a.m. in Courtroom 21D of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York, 10007. **The Court directs the parties to engage in good faith settlement negotiations prior to the conference with the Court.**

Dated: New York, New York
July 21, 2008

_Richard M. Berman_
**RICHARD M. BERMAN, U.S.D.J.**