UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x
In re WORLDSPACE, INC. SECURITIES     :     No. 07 Civ. 02252 (RMB)
LITIGATION                            :
——————————————————    :     CLASS ACTION
                                      :
This Document Relates To:             :     ECF Case
                                      :
     ALL ACTIONS.                     :
—————————————————— x

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION OF
SETTLEMENT PROCEEDS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

I.      PRELIMINARY STATEMENT ............................................................1

II.     HISTORY AND BACKGROUND OF THE ACTION ..............................4

III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND
        ADEQUATE AND SHOULD BE APPROVED BY THE COURT .................5

        A.      The Law Favors and Encourages Settlements ........................5

        B.      The Settlement Is Procedurally Fair ....................................6

        C.      The Second Circuit's Standards Governing the Substantive Fairness
                of Class Action Settlements ...............................................7

        D.      The Settlement Satisfies the Second Circuit Criteria for Approval ......8

                1.      The Complexity, Expense and Likely Duration of the
                        Litigation Justifies the Settlement ...........................8

                2.      The Reaction of the Class to the Settlement ...............11

                3.      The Stage of the Proceedings and Discovery Completed ........11

                4.      The Risk of Establishing Liability ..........................13

                5.      The Considerable Risk of Establishing Damages ...........15

                6.      The Risks of Maintaining the Class Action Through Trial .......17

                7.      The Reasonableness of the Settlement in Light of the Best
                        Possible Recovery and the Attendant Risks of Litigation ......18

                8.      The Ability of the Defendants to Withstand a Greater
                        Judgment ......................................................20

IV.     THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR
        AND REASONABLE AND SHOULD BE APPROVED BY THE COURT .........21

V.      CONCLUSION ....................................................................22

i

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Beecher v. Able*,
   575 F.2d 1010 (2d Cir. 1978).........................................................................21

*Berger v. Compaq Computer Corp.*,
   257 F.3d 475 (5th Cir. 2001) .........................................................................18

*Chatelain v. Prudential-Bache Sec.*,
   805 F. Supp. 209 (S.D.N.Y. 1992) ................................................................17

*Carpe v. Aquila, Inc.*,
   No. 02-0388-CV-W-FJG, 2005 U.S. Dist. LEXIS 44667 (W.D. Mo. Mar. 23, 2005)......17

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)........................................................................6, 12

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).............................................................................6

*Hicks v. Morgan Stanley & Co.*,
   No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005)........10

*In re "Agent Orange" Prod. Liab. Litig.*,
   597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987)...........................18

*In re Alloy, Inc., Sec. Litig.*,
   No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129 (S.D.N.Y. Dec. 2, 2004) ..........6

*In re Am. Bank Note Holographics*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001).......................................................13, 21

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
   No. MDL 1500, 2006 U.S. Dist. LEXIS 17588 (S.D.N.Y. Apr. 6, 2006)..................13, 19

*In re Ashanti Goldfields Sec. Litig.*,
   No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431 (E.D.N.Y. Nov. 15, 2005)...........5

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000).......................................................11, 13

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)..........................................................................17

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007 (S.D.N.Y. May 13, 2011)....6, 19

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ..........................................................................8, 20, 22

*In re Holocaust Victim Assets Litig.*,
413 F.3d 183 (2d Cir. 2001)................................................................................................22

*In re Indep. Energy Holdings PLC Sec. Litig.*,
No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090
(S.D.N.Y. Sept. 26, 2003) ...........................................................................................15, 18

*In re Luxottica Group S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) ......................................................................5, 6, 7, 11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ...................................................................................5

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 93423 (S.D.N.Y. Dec. 20, 2007) .........7

*In re Michael Milken & Assocs. Sec. Litig.*,
150 F.R.D. 46 (S.D.N.Y. 1993) .....................................................................................13

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y.) ................................................................................ *passim*

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093
(S.D.N.Y. May 1, 2008).........................................................................................10, 12, 20

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629
(S.D.N.Y. Nov. 7, 2007) .................................................................................... *passim*

*In re Visa Check/Mastermoney Antitrust Litig.*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003),
*aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)..........................................................................................5, 21

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)................................................................................................20

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)................................................................................21

*Joel A. v. Giuliani*,
　　218 F.3d 132 (2d Cir. 2000)............................................................................5

*Kaufman v. Motorola, Inc.*,
　　No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627 (N.D. Ill. Sept. 21, 2000)....................17

*Lewis v. Newman*,
　　59 F.R.D. 525 (S.D.N.Y. 1973) ......................................................................13

*Maley v. Del Global Techs. Corp.*,
　　186 F. Supp. 2d 358 (S.D.N.Y. 2002)...............................................20, 21, 22

*Milstein v. Huck*,
　　600 F. Supp. 254 (E.D.N.Y. 1984) ...................................................................8

*Newman v. Stein*,
　　464 F.2d 689 (2d Cir. 1972)....................................................................6, 18

*Plummer v. Chem. Bank*,
　　668 F.2d 654 (2d Cir. 1982),
　　*aff'd sub nom. D'Amato v. Deutsche Bank*,
　　236 F.3d 78 (2d Cir. 2001).............................................................................11

*Strougo v. Bassini*,
　　258 F. Supp. 2d 254 (S.D.N.Y. 2003)................................................................8

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
　　Master File No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608
　　(S.D.N.Y. May 14, 2004)...............................................................................12

*Taft v. Ackermans*,
　　No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007)..............5

*TSC Indus. v. Northway, Inc.*,
　　426 U.S. 438 (1976).....................................................................................14

*Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*,
　　396 F.3d 96 (2d Cir. 2005).....................................................................6, 18, 21

*In re Warner Commc'ns Sec. Litig.*,
　　618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................17

*Weinberger v. Kendrick*,
　　698 F.2d 61 (2d Cir. 1982)..............................................................................5

iv

*Wright v. Stern,*
     553 F. Supp. 2d 337 (S.D.N.Y. 2008).................................................................5

## Statutes and Rules

15 U.S.C. §77(a) ...............................................................................................15

15 U.S.C. §77(e) ...............................................................................................16

Fed. R. Civ. P.  23(b)(3)......................................................................................1

Fed. R. Civ. P.  23(e) ..........................................................................................1

## Other Authorities

4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* §11.45 (4th ed. 2002)................11

Private Securities Litigation Reform Act of 1995 ........................................................12

Stephanie Plancich, Ph.D., Brian Saxton, Svetlana Starkyh, *Recent Trends in Shareholder Class
Actions:  Filings Return to 2005 Levels as Subprime Cases Take Off; Average Settlements Hit
New High* (NERA 2007) .....................................................................................19

Pursuant to Rules 23(b)(3) and 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff Midtown Partners III, Inc., by and through its counsel ("Lead Counsel" or Lead Plaintiff's Counsel"), respectfully move this Court for an order approving the proposed settlement of the above-captioned class action (the "Action") and approving the proposed Plan of Allocation of the settlement proceeds, each of which this Court preliminarily approved by its Order Preliminarily Approving Settlement and Providing For Notice dated January 25, 2013 (the "Preliminary Approval Order").

## I.   PRELIMINARY STATEMENT

Under the terms of the proposed settlement (the "Settlement"), as set forth in the Settlement and Agreement dated October 11, 2012 (the "Stipulation"), Defendants[1] have paid or caused to be paid $2,375,000 in cash (the "Settlement Amount") into an interest-bearing escrow account maintained by Lead Counsel by its escrow agents on behalf of the Class,[2] in exchange for the dismissal of all claims brought against the Defendants in this Action and a full release of claims. The Settlement Fund (the Settlement Amount plus all interest earned thereon) will be used for the

---

[1] Defendants are WorldSpace, Inc. ("WorldSpace" or the "Company"), Noah Samara ("Samara") and Sridhar Ganesan ("Ganesan") (Samara and Ganesan are referred to as the "Individual Defendants, and collectively with WorldSpace as the "WorldSpace Defendants") , UBS Securities LLC ("UBS") and Cowen & Co., LLC ("Cowen" and together with UBS, the "Underwriters" or "Underwriter Defendants").

[2] "Class" means all persons who purchased the common stock of WorldSpace pursuant and/or traceable to the Company's initial public offering (the "IPO") on or about August 4, 2005 through March 16, 2006, inclusive, excluding (i) the Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any entity in which a Defendant has a controlling interest; (iv) the directors, officers, partners, subsidiaries and affiliates of any Defendant; (v) the legal representatives, heirs, predecessors, successors, or assigns of any Defendant; and (vi) any putative members of the Class who exclude themselves by timely and validly requesting exclusion in the manner approved by the Court. The Underwriter Defendants' clients who purchased WorldSpace common stock during the Class Period and any such clients for whom the Underwriter Defendants manage money or investments are not excluded.

- 1 -

payment of taxes, notice and administrative costs, and for Court-awarded attorneys' fees and expenses.  The remainder after these expenditures, the "Net Settlement Fund," will be distributed to members of the Class who are not otherwise excluded and who timely submit valid Proof of Claim and Release forms to the Claims Administrator ("Authorized Claimants").  Each Authorized Claimant shall be allocated a percentage of the Net Settlement Fund based upon the relationship that each Authorized Claimant's claim bears to the total of all Authorized Claimants' claims, as explained in the Notice of Settlement of Class Action Lawsuit (the "Notice").

Lead Counsel respectfully submit that this Settlement is an excellent recovery for the Class under the circumstances, given the serious obstacles to recovery.  This Settlement was reached by Lead Counsel, with the support of the Lead Plaintiff, as a result of their creative and aggressive litigation efforts, and following three separate mediation sessions before the late United States District Court Judge Nicholas Politan, who has mediated scores of complex representative litigations.  When viewed in light of the risks that Defendants could prevail at summary judgment or at trial, based on their defense to Lead Plaintiff's falsity claims and their position that the Class suffered little or no legally cognizable loss because of the alleged misstatements, but instead that if any material loss occurred, it was not the result of any information known by the Defendants at the time of the IPO and therefore was not recoverable, the Settlement is a substantial result for the Class. The Settlement also saves the Class the considerable expense and delay posed by continued litigation, especially here, where the parties still had document disputes to resolve and likely would need to expend significant resources locating witnesses, many of which would need to be subpoenaed, and travel, including to India, to conduct depositions.  Moreover, any judgment obtained would be complicated by WorldSpace's bankruptcy and the involvement of a Trustee, who, undoubtedly, would seek to protect the assets of the bankrupt estate.  Thus, collection of a judgment

against WorldSpace, arguably the party against which liability could most readily be found here, could have been problematic.  As discussed below and in the Declaration of Lawrence D. Levit in Support of Lead Plaintiff's Motion for:  (1) Final Approval of Settlement and Plan of Allocation of Settlement Proceeds; and (2) an Award of Attorneys' Fees and Expenses ("Levit Decl."), submitted herewith, the significant risks involved in taking this Action further in litigation, and possibly on to trial, when measured against the benefit of the Settlement, firmly support approval of this Settlement.

On January 25, 2013, the Court entered its Preliminary Approval Order, which directed that a hearing be held on May 22, 2013 to determine the fairness, reasonableness and adequacy of the Settlement (the "Fairness Hearing").  Pursuant to the Preliminary Approval Order, the Notice was mailed to more than 10,023 potential members of the Class commencing on February 7, 2013.[3]  The Summary Notice was also published in *Investor's Business Daily* on February 5, 2013.  *See* Keough Decl., ¶11.

The Court-approved Notice, attached to the Keough Declaration as Exhibit A, contains a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including: (i) Lead Plaintiff's estimate of the average per share recovery; (ii) the manner in which the Net Settlement Fund (as defined above) will be allocated among participating Class Members; (iii) a description of the claims that will be released in the Settlement; (iv) the right and mechanism for Class Members to opt out or exclude themselves from the Class; and (v) the right and mechanism for Class Members to object to the Settlement.

---

[3] *See* paragraphs 8 through 10 of the Declaration of Jennifer M. Keough Re Notice Dissemination and Publication ("Keough Decl."), which is submitted herewith.

The reaction of Class Members to the Settlement confirms the reasonableness of Lead Plaintiff's decision to resolve the Action against the Defendants in exchange for the payment of the Settlement Amount.  As of the date of this Memorandum, no objections have been filed to the amount of the Settlement or the Plan of Allocation.  Only one Class Member has submitted a request for exclusion from the proposed Settlement.  Therefore, the reaction of the Class strongly supports the inference that the Class agrees that the Settlement and Plan of Allocation are fair, reasonable and adequate.[4]

In light of Lead Counsel's informed assessment of the strengths and weaknesses of the claims and defenses asserted, the absence of opposition to the Settlement, and the considerable risks and delays associated with continued litigation and trial, Lead Plaintiff and Lead Counsel believe that the Settlement is fair, reasonable and adequate and provides a substantial result for the Class.  Accordingly, Lead Plaintiff respectfully requests that the Court grant final approval of this Settlement.  In addition, the Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damage consultant, is a fair and reasonable method for distributing the Net Settlement Fund to Class Members, and should also be approved by the Court.

## II.    HISTORY AND BACKGROUND OF THE ACTION

The Court is respectfully referred to the accompanying Levit Declaration for a full discussion of, *inter alia*, the factual background and procedural history of the Action, the litigation efforts of Lead Counsel, the significant risks of continued litigation, and a discussion of the negotiations leading to this Settlement.

_____

[4] If any objections are received, they will be addressed in a reply memorandum, which will be filed and served by May 15, 2013.

**III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED BY THE COURT**

**A.    The Law Favors and Encourages Settlements**

Rule 23(e) requires that the settlement of a class action be approved by the court.  A court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable, and not a product of collusion."  *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  This evaluation requires the court to consider "both the settlement's terms and the negotiating process leading to settlement."  *Wal-Mart Stores, Inc. v. VISA U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *Wright v. Stern*, 553 F. Supp. 2d 337, 343 (S.D.N.Y. 2008); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 165 (S.D.N.Y. 2007).  While the decision to grant or deny approval of a settlement lies within the broad discretion of the trial court, a general policy favoring settlement exists, especially with respect to class actions.  *Wright*, 553 F. Supp. 2d at 344; *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629, at *16 (S.D.N.Y. Nov. 7, 2007); *In re Ashanti Goldfields Sec. Litig.*, No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at *3-4 (E.D.N.Y. Nov. 15, 2005); *Taft v. Ackermans*, No. 02 Civ. 7951 (PKL), 2007 U.S. Dist. LEXIS 9144, at *13-14 (S.D.N.Y. Jan. 31, 2007); *see also Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (The settlement of complex class action litigations are clearly favored by the courts.).  Moreover, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Weinberger*, 698 F.2d at 73 ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a

proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974); *Veeco*, 2007 U.S. Dist. LEXIS 85629, at *17.  As the Second Circuit has stated:

> the role of a court in passing upon the propriety of the settlement of a derivative or other class action is a delicate one. . . . [W]e recognized that since "'the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation', the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial'."

*Newman v. Stein*, 464 F.2d 689, 691-92 (2d Cir. 1972) (citation omitted).

## B.    The Settlement Is Procedurally Fair

A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.  *Luxottica Group*, 233 F.R.D. at 315; *see also In re Alloy, Inc., Sec. Litig.*, No. 03 Civ. 1597 (WHP), 2004 U.S. Dist. LEXIS 24129, at *5 (S.D.N.Y. Dec. 2, 2004).  A court may find the negotiating process is fair where, as here, "the settlement resulted from 'arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability . . . necessary to effective representation of the class's interests.'"  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (citation omitted); *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895 (DAB), 2011 U.S. Dist. LEXIS 53007, at *10-11 (S.D.N.Y. May 13, 2011) (court must pay close attention to the negotiating process, that they were at arm's-length and that class counsel had the requisite experience and ability); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement."), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

This initial presumption of fairness and adequacy applies here because the Settlement was reached by experienced, fully-informed counsel after arm's-length negotiations, with the assistance

of Judge Politan, who was an experienced mediator and retired federal District Court Judge from the

District of New Jersey.  Levit Decl. ¶¶ 6, 50.  In addition, no question exists that Lead Counsel –

equipped with knowledge from an extensive investigation and evaluation of Lead Plaintiff's claims,

plus the review of hundreds of thousands of pages of non-public documents produced by

Defendants, and extensive submissions by the parties to Judge Politan and arguments made

regarding various factual and legal issues during the three mediation sessions as well as separate

negotiations between the parties – were fully informed of the merits and weaknesses of the case by

the time the Settlement was consummated.  *See* Levit Decl. ¶¶ 8, 61-62.  All of these considerations

confirmed the reasonableness of the Settlement, and thus, little doubt exists that this Settlement is

entitled to the presumption of procedural fairness dictated by Second Circuit law.

### C.    The Second Circuit's Standards Governing the Substantive Fairness of Class Action Settlements

As stated above, courts within the Second Circuit observe the universal standard for

determining whether a proposed class settlement is substantively fair: whether the proposed

settlement is "'fair, reasonable, and adequate.'"  *Luxottica Group*, 233 F.R.D. at 310 (citation

omitted).  The Second Circuit has identified nine factors that courts should consider in deciding

whether to approve a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of
> the class to the settlement, (3) the stage of the proceedings and the amount of
> discovery completed, (4) the risks of establishing liability, (5) the risks of
> establishing damages, (6) the risks of maintaining the class action through the trial,
> (7) the ability of the defendants to withstand a greater judgment, (8) the range of
> reasonableness of the settlement fund in light of the best possible recovery, [and] (9)
> the range of reasonableness of the settlement fund to a possible recovery in light of
> all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted).  All nine factors need not be satisfied.  Instead, the

court should look at the totality of these factors in light of the specific circumstances involved.  *In re*

*Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist.

LEXIS 93423, at *25-26 (S.D.N.Y. Dec. 20, 2007); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

As demonstrated below, the Settlement satisfies the relevant criteria set forth above.  Indeed, this Settlement represents a significant recovery for the Class, and, in the judgment of Lead Counsel, there is serious doubt that a more favorable result was possible.  As such, the Settlement clearly warrants this Court's final approval.

### D.  The Settlement Satisfies the Second Circuit Criteria for Approval

#### 1.  The Complexity, Expense and Likely Duration of the Litigation Justifies the Settlement

"The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement."  *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984).  *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003) ("'[I]t is beyond cavil that continued litigation in this multi-district securities class action would be complex, lengthy, and expensive, with no guarantee of recovery by the class members.'") (citation omitted).  Here, Defendants' adamant contention that they did no wrong would likely have contributed to a lengthy and expensive litigation absent the proposed Settlement.  WorldSpace was a developer of satellite radio, which it sold primarily in India and China.  It was a subscription-based service, which required a large customer base to succeed.  It needed to be able to attract and retain subscribers for its business model to prosper.

Here, the securities claims advanced by Lead Plaintiff involved numerous complex factual issues relating to how to determine the number of subscribers and how to calculate churn properly (*i.e.*, churn seeks to measure the number of subscribers who stop contracting for the Company's services during an applicable time period), which was complicated by a promotional campaign implemented by WorldSpace to increase subscriptions as well as the fact that because it was a new

enterprise, it did not have an established history upon which to determine churn rates.  Defendants vehemently disputed that any materially false or misleading statements were made in WorldSpace's offering documents, but instead claimed to have disclosed the number of subscribers accurately and claimed that no material information about subscriber numbers or trends was omitted from those documents.  Defendants further claimed that any variation from the subscriber number could not have been material given that WorldSpace needed a vast number of subscribers for its business to succeed and any difference in the actual number was de minimus.

Moreover, Defendants claimed that WorldSpace's stock price did not decline in response to the disclosure of any previously omitted information from its IPO or of its churn rate.  WorldSpace contended that it explicitly informed investors that it was not disclosing its churn rate because it did not yet have sufficient data to provide information on that topic.  In addition, any statistics on subscriber numbers were necessarily tied into a promotional campaign whereby the Company provided its services for a limited time, which campaign began after the IPO.  The Company also contended that although some subscribers' names remained on its records after their subscription ended, as they were provided with a grace period before they were disconnected from the service, those people would not be counted as paying subscribers.  Finally, Defendants claimed that certain information was disclosed by analysts during the Class Period and thus Plaintiffs' claims were barred by the statute of limitations.  Many of Lead Plaintiff's allegations, and the defenses raised by Defendants, would require analysis by experts, including as to the calculation of the proper churn rate.  In addition, the legal issues in this Action are equally complex – proving falsity, materiality, causation and damages – and would also require expert testimony from both sides.

There can be no doubt that because this Action is settling against the Defendants at this time, the litigants and the Court have been spared the delay and expense of continued litigation.  Even if

the Class could recover a larger judgment after a trial, the additional delay through trial, post-trial motions, and the appellate process could deny the Class any recovery for years, further reducing its value. *See In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *17-18 (S.D.N.Y. May 1, 2008) ("*Sony*"); *Strougo*, 258 F. Supp. 2d at 261 ("even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery"); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *16 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").  In addition, here, even if Lead Plaintiff was able to obtain a judgment against WorldSpace after several more years of litigation, because WorldSpace was involved in bankruptcy proceedings, it would be difficult for Lead Plaintiff to collect any judgment against it.  While Lead Plaintiff might also have been able to obtain liability against other Defendants, given that WorldSpace was the issuer of the securities, liability against the Company would have been more readily obtainable than against the other Defendants, which may have had more persuasive defenses available to the claims, including that they conducted appropriate due diligence and operated in good faith.  In any event, collecting on any judgment would have been an additional issue that Lead Plaintiff would have needed to overcome, including possible litigation in Bankruptcy Court, likely would not have been resolved for several additional years, with the increased risk of either being unable to enforce the judgment or to collect on the judgment.  The Settlement avoids these additional risks.

The Settlement at this juncture results in an immediate and substantial tangible recovery for the Class without the considerable risk, expense and delay of trial. Lead Counsel submit that the Court should find that this factor weighs heavily in favor of the proposed Settlement.

### 2. The Reaction of the Class to the Settlement

The reaction of the class to the settlement is a significant factor in assessing its fairness and adequacy, and "'the absence of objectants may itself be taken as evidencing the fairness of a settlement.'" *PaineWebber*, 171 F.R.D. at 126 (citation omitted); *see also Luxottica Group*, 233 F.R.D. at 311-12. One court has noted that the reaction of the class to a settlement "is considered perhaps 'the most significant factor to be weighed in considering its adequacy.'" *Veeco*, 2007 U.S. Dist. LEXIS 85629, at *21 (citation omitted). Here, in response to a wide-ranging Court-approved notice program, not a single Class Member has objected to the Settlement or any of its terms to date, and only one shareholder has requested exclusion from the Class. Thus, the reaction of the Class, those affected by the Settlement, underscores the propriety of the Settlement and should provide additional comfort to this Court in approving the Settlement. Levit Decl. ¶¶ 58-60.

### 3. The Stage of the Proceedings and Discovery Completed

"There is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation. . . . At minimum, the court must possess sufficient information to raise its decision above mere conjecture." 4 Alba Conte, Herbert B. Newberg, *Newberg on Class Actions* §11.45, at 127, 128 (4th ed. 2002). *See also In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (it is not necessary for a court to find parties engaged in extensive discovery; a court must merely find that they engaged in sufficient investigation to enable court to make intelligent appraisal of case) (citing *Plummer v. Chem. Bank*, 668 F.2d 654 (2d Cir. 1982)),

- 11 -

*aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001); *see also Veeco*, 2007 U.S. Dist. LEXIS 85629, at *22-23 ("the parties need not have engaged in full discovery for a settlement to be approved as fair"); *Sony*, 2008 U.S. Dist. LEXIS 36093, at *20-21 (same).[5]

Here, Lead Counsel negotiated a substantial settlement only after conducting an extensive investigation, successfully opposing Defendants' motion to dismiss, analyzing a significant amount of formal discovery, including the review of more than 365,000 pages of non-public documents, and researching issues relating to the satellite radio industry, subscriber information and churn calculations. Lead Counsel also researched the applicable law with respect to Lead Plaintiff's claims and the Defendants' potential defenses, opposed Defendants' several attempts to file a summary judgment motion prior to the close of fact discovery, drafted (but had not yet filed) a class certification motion and consulted with experts who provided advice and assistance on issues relating to damages and causation. Lead Counsel drafted extensive submissions in preparation for the mediation sessions, and also held discussions with Defendants' counsel during and after the mediation sessions that crystallized for them the defenses that would be pressed if the case progressed. Thus, Lead Counsel had a clear picture of the strengths and weaknesses of this case and of the legal and factual defenses that Defendants would likely raise at trial. *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, Master File No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608, at *10 (S.D.N.Y. May 14, 2004) (finding action had advanced to a stage where parties "'have a clear view of the strengths and weaknesses of their cases'") (citation omitted). As such, Lead Counsel had sufficient information to negotiate intelligently the terms of the Settlement that is before the Court

---

[5]     In fact, in cases such as this one brought under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), no formal discovery may proceed until the motion to dismiss is denied or an answer is filed.

for approval.  *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 426 (S.D.N.Y. 2001).

Therefore, this Court should find that this factor also supports the Settlement.

### 4.    The Risk of Establishing Liability

In assessing the Settlement, the Court should balance the benefits afforded to the Class,

including the immediacy and certainty of a recovery, against the continuing risks of litigation.  *See*

*Grinnell*, 495 F.2d at 463; *Veeco*, 2007 U.S. Dist. LEXIS 85629, at \*25; *Austrian & German Bank*,

80 F. Supp. 2d at 177.  While Lead Counsel believes that Plaintiffs[6] could survive Defendants'

promised motion for summary judgment and would have prevailed on Plaintiffs' anticipated motion

for class certification, it is also clear that ultimate success was not assured, and this settlement, when

viewed in light of the risks of proving liability, proving damages and enforcing and collecting a

judgment, is undoubtedly fair, adequate and reasonable.  *See In re Michael Milken & Assocs. Sec.*

*Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (when evaluating securities class action settlements, courts

have long recognized such litigation to be "'notably difficult and notoriously uncertain'") (quoting

*Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973)); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52

F.R.D. 151, 159 (S.D.N.Y. 1971) ("Stockholder litigation is notably difficult and unpredictable.").

Plaintiffs faced numerous hurdles to establishing liability.  This Action involves claims for

relief under the Securities Act of 1933 (the "Securities Act").  To prevail on these claims, Plaintiffs

must demonstrate that Defendants made misstatements or omissions of material fact in connection

with the Company's Registration Statement and Prospectus for its IPO (the "Offering Documents").

Based on the defenses that Defendants have raised, Lead Counsel recognized that establishing

liability at trial was not guaranteed.  *See In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No.

_____

[6] While there is only one Lead Plaintiff, more than one plaintiff brought the Action on behalf of a
class and therefore, at times, plaintiffs are referred to in the plural herein.

MDL 1500, 2006 U.S. Dist. LEXIS 17588, at *39 (S.D.N.Y. Apr. 6, 2006) ("[t]he difficulty of establishing liability is a common risk of securities litigation").

Most significantly, Plaintiffs faced substantial risks in proving that the alleged misstatements and omissions in the Offering Documents were materially false or misleading.  *See In re: Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264-66 (2d Cir. 1993) (to prove materiality, plaintiffs have the burden of demonstrating defendants' misrepresentations and omissions were materially false or misleading when made); *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  In their response to Lead Plaintiff's claims, Defendants have vigorously asserted that the Offering Documents did not contain any misstatements or omissions.  Rather, Defendants repeatedly claimed that they accurately disclosed the number of subscribers for the Company's services and that any variation was not material.  Defendants further contended that the Company was able to calculate its subscriber numbers accurately, that the churn rate was specifically not mentioned in the Offering Documents, and that it was disclosed to the market that it was too soon to provide data on churn.  In any event, Defendants claimed that churn was not an issue raised by Plaintiffs, but even if it were, the facts did not support a claim by Plaintiffs.  Defendants further contended that any dispute as to whether non-paying subscribers remained in the Company's subscriber count was the result of a promotional campaign instituted after the IPO and thus was incapable of providing a basis for Plaintiffs' claims.  Thus, Defendants concluded that Plaintiffs would not be able to establish falsity.  Levit Decl. ¶¶ 70-71.  Although Plaintiffs contended that the Offering Documents failed to reveal the accurate subscriber numbers or that the trend in the churn rate was problematic, by the time the parties agreed to the proposed Settlement, Lead Counsel had come to the conclusion that the falsity defenses raised by Defendants could have certain jury appeal, and would render the inherently difficult burden of proving all of the elements of Plaintiffs' claims as to all of the Defendants even more difficult.

In addition, while Lead Plaintiff disputed Defendants' claim that it was only a temporary promotional campaign that resulted in some subscribers remaining on the Company's records as a subscriber even though they stopped paying for services, Lead Plaintiff recognized that such issue would have required complex and technical testimony to the jury, involving calculations about when grace periods began and ended and when the Company updated its passcode giving access to its services, and when the Company's records were updated, which may have been persuaded that WorldSpace's subscriber numbers were accurate and/or that this promotional campaign had no impact on such numbers at the time of the IPO. The proposed Settlement avoids having to resolve these issues.

### 5. The Considerable Risk of Establishing Damages

Even if they successfully established liability, Lead Plaintiff also faced substantial risk in proving the existence and the amount of damages. *See In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689 (SAS), 2003 U.S. Dist. LEXIS 17090, at *11-*12 (S.D.N.Y. Sept. 26, 2003) (noting difficulty of proving damages in securities cases). Damages under Securities Act claims are statutorily set: damages represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (i) the value thereof as of the time such suit was brought; or (ii) the price at which such security shall have been disposed of in the market before suit; or (iii) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages as calculated in subsection (i). *See* 15 U.S.C. §77(a). Lead Counsel, with the assistance of their damage consultants, calculated the damages suffered by the Class attributable to the alleged misstatements and omissions. This figure assumes that every element of the Class' damages theory is accepted by a jury as being correct and recoverable. As such, its viability as an actual calculation for damages could be affected by many factors that may arise in the Action, such as Defendants' ability to establish "negative causation"

- 15 -

under §11(e) of the Securities Act.  If a defendant can prove that the decline in the value of the security in question was not caused by the material omissions or misstatements in the registration statement, such portion of damages shall not be recoverable.  *See* 15 U.S.C. §77(e).

Indeed, Defendants vigorously disputed Lead Plaintiff's allegations that the Company's stock price declined because of any of the alleged misstatements and/or omissions.  Rather, Defendants adamantly claimed that any price decline was not connected to a misstatement of subscriber numbers in the Offering Documents, and, if anything, it was connected to a promotional campaign that took place several months after the IPO.  While Lead Counsel disagreed with Defendants' argument, the promotional campaign did occur after the IPO and data relating to it may have contributed to the Company's stock price decline, and thus, a significant portion of Lead Plaintiff's claimed damages may have been difficult to prove.  Moreover, as to whether the Company had the ability to disconnect subscribers and accurately determine its subscriber numbers and churn rate at any point in time, Defendants claimed that this information was disclosed by Defendant Ganesan in November 2005 and then again by analysts in December 2005.  Thus, even if these disclosures did not bar Plaintiffs' claims on statute of limitations grounds, this negative information was disclosed to the public.  Thus, to the extent Defendants arguments succeeded, even if only partly, the amount of Plaintiffs' claimed damages would have been further eroded.

The determination of damages in this litigation is a complex matter which would require the presentation of expert testimony.  As a result, the Class would ultimately face a "battle of experts" – a battle in which no party is ever assured to prevail.  While Lead Counsel believe that reliable and convincing expert testimony can be provided on the damages question, and that a judgment could ultimately be obtained for the full amount of damages available under the law, meaningful obstacles remained.  First, the Court must determine that Plaintiffs' damages model is admissible and only

then may a jury determine whether Plaintiffs' or Defendants' model is more accurate. The Class is by no means assured of a ruling in their favor. *See, e.g.*, *Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG, 2005 U.S. Dist. LEXIS 44667, at * 14 (W.D. Mo. Mar. 23, 2005) (granting defendants' motion to exclude plaintiffs' expert testimony);[7] *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627, at *7 (N.D. Ill. Sept. 21, 2000) (precluding in part plaintiffs' expert testimony). It is then possible that, in the unavoidable "battle of experts," a jury might disagree with the Class' expert, or merely find Defendants' expert more persuasive.[8]

Because of these considerations, the likelihood of proving damages, even assuming the Class prevailed on the liability issue, is somewhat difficult. *See Veeco*, 2007 U.S. Dist. LEXIS 85629, at *29. As a result, this factor also weighs in favor of the Settlement.

###### 6.     The Risks of Maintaining the Class Action Through Trial

Had the Settlement not been reached, there is no assurance that Lead Plaintiff's anticipated motion for class certification would be granted and/or that Class status, if granted, would be maintained, because a court may exercise its discretion to re-evaluate the appropriateness of class certification at any time. *See Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 214 (S.D.N.Y.

---

[7]     All unreported authorities referred to herein are attached to the Compendium of Unreported Authorities in Support of Lead Plaintiff's Motion for:  1) Final Approval of Settlement and Plan of Allocation of Settlement Proceeds; and 2) An Award of Attorneys' Fees and Expenses, submitted herewith.

[8]     *See, e.g.*, *PaineWebber*, 171 F.R.D. at 129 (noting unpredictability of outcome of battle of damage experts); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) ("In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions."), *aff'd*, 798 F.2d 35 (2d Cir. 1986).  *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("establishing damages at trial would lead to a 'battle of experts' . . . with no guarantee whom the jury would believe").

- 17 -

1992) ("Even if certified, the class would face the risk of decertification."); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) (decertifying class, finding proposed class representatives did not sufficiently remain apprised of status and claims of litigation). Here, it was expected that Defendants would challenge the class certification motion and they would likely have attempted to prevent the proposed Class representative from being certified. Even if the class certification motion was granted, Defendants would likely have continued to attempt to try to find infirmities with the class representative and remove it from that role. The Settlement avoids any uncertainty with respect to these issues.

### 7. The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). "[T]he Court is not to compare the terms of the Settlement with a hypothetical or speculative measure of a recovery that might be achieved by prosecution of the litigation to a successful conclusion." *Veeco*, 2007 U.S. Dist. LEXIS 85629, at *33. The Court need only determine whether the Settlement falls within a "'range of reasonableness.'" *PaineWebber*, 171 F.R.D. at 130 (citation omitted); *Newman*, 464 F.2d at 693 ("[I]n any case there is a range of reasonableness with respect to a settlement."). *See also Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *13 (noting few cases tried before jury result in full amount of damages claimed). The Second Circuit has described the "'range of reasonableness'" as "'a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in . . . any litigation.'" *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman*, 464 F.2d at 693). According to estimates by Lead Plaintiff's damage

consultants, this recovery represents approximately 3.3 - 5% of the Class's maximum provable damages, depending on certain liability issues Plaintiffs could or could not prove at trial.[9]  Thus, this Settlement exceeds the average recovery in shareholder litigation.  *See China Sunergy,* 2011 U.S. Dist. LEXIS 53007, at *15 (average settlement in securities class actions over the past decade ranged from 3% to 7% of class members' estimated losses) (citation omitted); Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2011 Review and Analysis*, at 7 (Cornerstone Research 2012) (the median recovery rate of "estimated damages" for securities cases averaged 2.1% in 2011); *see also* Stephanie Plancich, Ph.D., Brian Saxton, Svetlana Starkyh, *Recent Trends in Shareholder Class Actions:  Filings Return to 2005 Levels as Subprime Cases Take Off; Average Settlements Hit New High*, at 14 (NERA 2007) (median ratio of settlements to investor losses in 2007 was 2.4%).[10]

Finally, in analyzing the reasonableness of the Settlement, the Court should consider that the Settlement provides for payment to the Class now, rather than a speculative payment many years down the road, without any further risk to the Class.  *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *44 (where the settlement fund is in escrow and earning interest for the class, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").  This case has been pending for almost six years, and could be expected to last additional years had the Settlement not been reached.  Even though much has occurred during the course of the litigation, much still remained before a trial could take place.  Moreover, Lead Plaintiff would likely have

---

[9]     Lead Plaintiffs' damage consultants have estimated the maximum provable damages to be in the range of approximately $47.1-71.7 million.

[10]    Not surprisingly, Defendants calculated damages, if any, at significantly less than Lead Plaintiff, given their "negative causation" defenses.

difficulty trying to enforce and collect any judgment from WorldSpace given its bankruptcy filing – a process that could add years onto the time of obtaining a judgment after trial and appeals.  In light of the complex legal and factual issues typically present in securities class actions, the unpredictability of a lengthy and complex trial and the appellate process that would most likely follow, and then trying to collect on any judgment, the fairness of a substantial settlement is clearly apparent.  *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 366 (S.D.N.Y. 2002).

### 8. The Ability of the Defendants to Withstand a Greater Judgment

The court may also consider the defendants' ability to withstand a judgment greater than that secured by settlement.  *Grinnell*, 495 F.2d  at 463.  However, the fact that Defendants could have paid more money does not render the Settlement unreasonable.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached."); *Sony*, 2008 U.S. Dist. LEXIS 36093, at *23 ("a defendant is not required to 'empty its coffers' before a settlement can be found adequate") (citation omitted).  "Where, as here, the other Grinnell factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair."  *Id.* at *23-24.  In any event, here, WorldSpace is in the process of being liquidated and does not have an operational business. Thus, the prospect of being able to obtain any payment from it are not favorable.  While the Underwriter Defendants have that ability, they also have strong defenses, and they may have been able to avoid all liability.  Recovery from individuals is always difficult in cases of this nature, and while insurance would provide some coverage for the Individual Defendants, if the case were to go to trial and a judgment obtained, much, if not all, of the insurance would be expended.

Accordingly, Lead Counsel submit that this Court should find that the *Grinnell* factors, taken together, weigh in favor of the Settlement and that the Settlement should be approved.

## IV.   THE PLAN OF ALLOCATION OF THE SETTLEMENT FUND IS FAIR AND REASONABLE AND SHOULD BE APPROVED BY THE COURT

The standard for approval of a plan of allocation is the same as the standard for approving the settlement as a whole: "'namely, it must be fair and adequate.'"  *Maley*, 186 F. Supp. 2d at 367 (citation omitted); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005).  "'As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable' under the particular circumstances of the case." *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 518 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) (citation omitted).  A plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *Am. Bank Note*, 127 F. Supp. 2d at 429-30 (citation omitted); *see also WorldCom*, 388 F. Supp. 2d at 344 (same).  Further, courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978).

The Plan of Allocation, which was fully described in the Notice, has a rational basis and was formulated by Lead Counsel, in consultation with their damage consultant, ensuring its fairness and reliability.  *See Veeco*, 2007 U.S. Dist. LEXIS 85629, at *39.  Under the proposed Plan of Allocation, each Authorized Claimant (as defined in Section 1(a) of the Stipulation) will receive a *pro rata* share of the Net Settlement Fund, with that share to be determined by the ratio that the Authorized Claimant's allowed claim bears to the total allowed claims of all Authorized Claimants.

The Plan of Allocation takes into account, among other things, whether and when Class Members sold their WorldSpace common stock.  Accordingly, some shareholders may benefit more

from the Settlement than others depending upon when they made their transactions.  This is fair and reasonable, as there is no rule that a settlement benefit all class members equally.  *Veeco*, 2007 U.S. Dist. LEXIS 85629, at *39; *Global Crossing*, 225 F.R.D. at 462.  Indeed, it is appropriate for interclass allocations to be based upon, among other things, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue.  *See In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001).  Otherwise, certain class members may receive an inequitable windfall, to the detriment of others.  *PaineWebber*, 171 F.R.D. at 133.

Lead Counsel believe that the Plan of Allocation is fair and reasonable, and respectfully submit that it should be approved by the Court.  Notably, not one objection to the Plan of Allocation has been filed, which also supports approval by the Court.  *See Veeco*, 2007 U.S. Dist. LEXIS 85629, at *40; *Maley*, 186 F. Supp. 2d at 367.

## V.    CONCLUSION

The Settlement reached in this Action is an exceptional result under the circumstances present here.  For the foregoing reasons, the Settlement and Plan of Allocation of the Settlement proceeds are fair, reasonable and adequate and should be granted the Court's final approval.

DATED:  May 1, 2013                          Respectfully submitted,

ABRAHAM FRUCHTER & TWERSKY LLP


s/ Lawrence D. Levit
LAWRENCE D. LEVIT

JACK G. FRUCHTER
LAWRENCE D. LEVIT
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

Lead Counsel for Plaintiffs